GEORGE McDOWELL ET AL.
vs.
SAMUEL H. GOLDSMITH.     September Term, 1851

[VACATING CONVEYANCES—CHANCERY PRACTICE—EVIDENCE—LIMITATIONS.]

A mortgage was executed in accordance with the provisions of the act of 1833, ch. 181, and upon the petition of the mortgagee in conformity with said act, a decree was passed by Baltimore County Court, as a court of equity, providing for a sale of the mortgaged property, for the payment of the mortgage debt. Upon a bill filed to set aside this mortgage, as fraudulent as against creditors, but not seeking to interfere with the decree, it was HELD—

That this court has not the power to vacate this decree of Baltimore County Court, that court, by the terms of the act of 1833, ch. 181, having concurrent jurisdiction with this court, to pass such decrees, and, therefore, the mortgage, the foundation of that decree, cannot be impeached here.

Lenders of money, being less, under the pressure of circumstances, calculated to control the free exercise of judgment than borrowers, may often be tempted to avail themselves of that advantage, in order to attain inequitable bargains. The leaning of courts of equity is, therefore, against them, and presumptions are not made in their favor.

The refusal of a defendant to answer, is not to be taken as an admission of the allegations of the bill which have not been answered : but this rule of chancery practice will not exempt a defendant from some degree of suspicion, because of his declining to answer interrogatories to which he might easily have answered, and without subjecting him, so far as the court can see, to the slightest annoyance or inconvenience.

The declarations of a grantor, that the object of the deed was to defeat her creditors, made at the time of the execution of the deed, though not in the presence of the grantee, are admissible in evidence as part of the *res gesta*, against the grantee upon a proceeding to vacate the deed for fraud.

Where the grantee first called on the scrivener who prepared the deed, and told him the grantor would call on him and give him instructions about it, and the grantor did call accordingly and give the instructions, according to which the deed was prepared and executed; and the declarations of the grantor then made, being offered to show that the object of the deed was to defeat the creditors of the grantor. It was HELD—

That by referring the draftsman of the deed to the grantor for instructions, the grantee must be considered, to some extent at least, as constituting the grantor his agent, and then, of course, the declarations of the agent made in the course of, and accompanying the transaction, would be admissible.

An original creditor's bill was filed on the 25th of August, 1845, and by an amended bill, filed on the 1st of April, 1851, certain other parties came in as complainants. HELD—

That though according to the law and practice of this court, they may come in as co-complainants with the originally suing creditors, yet limitations will run against their claims until they do so come in and file them.

Where a creditor's bill was filed to vacate certain deeds as fraudulent as against such creditors, and the statute of limitations was pleaded to their claims, It was HELD—That the question, so far as it involves the existence of such claims, is of a legal nature, or would be cognizable at law, and in such cases, courts of equity govern themselves by the same limitations as the statute prescribes, to suits in the common law courts, acting not upon the ground of analogy, but in obedience to the statute.

Length of time ought not to be permitted to repel relief where fraud is imputed and proved, but the party relying upon the fraud to excuse his delay, can only do so successfully when the fraud has been concealed from him. In cases of fraud and mistake, the statute of limitations begins to run from the time of the discovery of the fraud or mistake.

It is believed no case can be found in which relief has been extended to a party in equity, in opposition to the statute of limitations, upon the ground of fraud, when the fact imputed as fraudulent, was discovered by the party at a period beyond the time allowed by the statute for the assertion of his rights.

Where deeds are declared to be fraudulent against the creditors of the grantor, the plea of limitations may be allowed to avail those of the parties claiming under the deeds, who rely upon it.

---

[The original bill in this case was filed in the equity side of Baltimore County Court, on the 25th of August, 1845. It alleges that a certain Elizabeth Osborne, late of the city of New York, deceased, was in her lifetime, seized and possessed, in her own right, of a large amount of real and personal property, situated in the city of Baltimore, and whilst so seized and possessed of said property, she became, *bona fide*, indebted to the complainants therein named, and remained so indebted at the time of her decease. That said Elizabeth, in her lifetime, executed three deeds or instruments of writing, by which she conveyed to Samuel H. Goldsmith, the defendant, all the real and personal property of which she was, at the time of the execution thereof, seized and possessed. That said deeds bear date as follows : the first upon the 14th of July, 1841, and professes, in consideration of the sum of $2,000, to convey to the defendant, a certain piece of ground therein described. The second, dated the 5th of November, 1842, is a mortgage to the defendant, of certain real and personal property therein described, to secure a pretended indebtedness, in the sum of $21,500. The third is dated the 16th of February, 1844, by which the grantor, in consideration of her pretended indebtedness, mentioned in the above mortgage, and in satisfaction

thereof, and in the further pretended consideration of $7,550, conveys to the defendant all her right and equity of redemption, to the property described in the deed of mortgage, all of which will more fully appear from said deeds filed as exhibits, No. 1, No. 2, and No. 3.

The bill further states and charges, that under these three deeds, the defendant claims all the property in them mentioned, as absolutely his own. That said Elizabeth Osborne died about the month of April, 1845, and besides the property mentioned in said deeds, left no property or fund, out of which the debts of the complainants could be paid, and that said debts remain wholly unpaid, and unsatisfied. That the said defendant did not, in fact, pay to the said Elizabeth Osborne the consideration in said deeds mentioned, and pretended to have been paid, or any part thereof, but that said deeds were executed by the said Osborne, without any legal consideration, and for the purpose of protecting her property from the just claims of her creditors. That shortly before, at the time of, and repeatedly after, the executinn of these deeds, she declared they were executed without consideration, and merely for the purpose of protecting her property from her creditors, who were urgent for the payment of their claims against her. That the property mentioned in deeds No. 2, and No. 3, continued in the possession of said Elizabeth, and that the defendant has repeatedly admitted that said property did not belong to him, but that he held the title nominally, to protect it from the creditors of said Elizabeth; that he executed before Wm. A. Schaeffer, a justice of the peace, an instrument in writing, by which he acknowledged that he held all said property in the said two deeds last referred to, for the benefit of the said Elizabeth, and to protect it from her creditors. That said property stood in the name of the said Elizabeth in the tax books of the city of Baltimore, and that she had paid all the taxes thereon, up to the time of her death. That the rents arising from all the real and leasehold property, mentioned in the deeds Nos. 2 and 3, were received by said Elizabeth to her own use, and the ground rents payable on a portion of said property, were

paid by her, and that the insurance thereon was in her name, and for her benefit, down to the 1st day of January, 1845; and that the defendant did not, at any time during the life of said Elizabeth, effect an insurance on said property, or any part thereof.

The bill further charges, that the said defendant was not, at the time of the execution of the deed therein referred to, engaged in any business, or possessed of any property, means, or credit, by which he could possibly have raised or commanded the large amount of money pretended to have been paid and advanced by him to the said Elizabeth. And that the complainants afterwards applied to the defendant to permit a sale of said property to be made, and their debts to be paid thereout, but that he refused so to do, pretending that he paid for the said property, and that he was a man of wealth, and able so to do, which they charge is not the fact. The bill then prays that said deeds may be declared null and void, as against the creditors of said Elizabeth Osborne, and that they may be paid their debts with interest and costs, and for general relief. And also, that the said defendant may be required to answer the following special interrogatories, accompanying said bill, namely:

1st. State particularly how, and at what time or times, Elizabeth Osborne became indebted to you in the sum of $21,500, for which sum it is alleged she executed her promissory note to you on the 5th of November, 1842.

2d. If for goods, wares, merchandise or property, sold and delivered by you to her, furnish a particular account thereof, with the prices for which they were sold, and the times of such sales and delivery, and from whom you procured the goods, &c., sold to her.

3d. If you say she was indebted to you for money loaned, or advanced to her by you, state particularly at what times, and in what sums it was loaned, and in whose presence it was done. If it was your own money, state how you acquired and became possessed of it; with what bank or individual you had it on deposit, and whether the funds consisted of coin or paper. If it

33

was not your own money, state to whom it belonged, and how and when, and upon what terms, and in what sums you obtained it.

4th. State particularly in what kind of money, in whose presence, at what place, and at what time, you paid to Elizabeth Osborne the sum of $7,550, the alleged consideration in part for the deed of the 16th of February, 1844. If it was your own money, state how you earned, acquired, or became possessed of it; by whom it was paid to you, and for what. State whether you had it on deposit in any bank. If so, what bank, or if any individual, if so, with whom. If it was not your own money, state to whom it belonged, and how, and upon what terms and when you procured it.

5th. State where you have resided for the last ten years, what business you have been engaged in, what capital you have in your business, and what has been your annual profits. State what property you have owned in the ten years past, how, and to whom you disposed of it, and what property you now own.

6th. Did you not execute and deliver to Elizabeth Osborne, an instrument of writing acknowledging that you had no legal or just title to the property mentioned in the deeds, or only a lien upon it for a sum much less than is mentioned as the consideration of the deeds referred to, in this bill of complaint? If you did, state whether you have seen that paper since the death of Elizabeth Osborne. State when you saw it, at what place, in whose possession, and what has become of it.

Exhibit No. 1, filed with the bill, is sufficiently described in the bill. Exhibit No. 2, is a mortgage from Elizabeth Osborne to Samuel H. Goldsmith, and is dated the 25th day of November, 1842, and recites that "whereas, the party of the first part is, and stands indebted unto the party of the second part, in the full and just sum of twenty-one thousand five hundred dollars, lawful money, for which sum, the former has passed to the latter, a promissory note of even date herewith, drawn by the said Elizabeth Osborne, in favor of the said Samuel H. Goldsmith, or order, payable at or before the expiration of five

years after date, with legal interest thereon, in the meantime, payable semi-annually." And to secure said sum with interest thereon, the freehold, leasehold and personal property therein described, consisting of various lots and houses, and the furniture therein, in the city of Baltimore, is conveyed to said Goldsmith, subject to the condition of payment, by the said Elizabeth, her heirs, executors, administrators or assigns, of the said sum of $25,500, on or before the expiration of five years next ensuing the date thereof, with legal interest thereon, semi-annually, according to the tenor of the aforesaid promissory note. The said conveyance also contains the following clause : "And the said Elizabeth Osborne hereby declares her assent to the passing of a decree by the Chancery Court of Maryland, or by Baltimore County Court, sitting as a court of equity, for a sale of the hereby mortgaged estate, property and premises, in accordance with the provisions of an act of the general assembly of the state aforesaid, passed at December session, one thousand eight hundred and thirty-three, chapter 181, entitled 'an Act relating to Mortgages.' " "And further, it is hereby declared, that this conveyance made subject to the provisions of an act of the general assembly of Maryland, passed at December session, 1836, entitled 'an Act relating to Mortgages in the city of Baltimore.' " This conveyance was also made subject to three mortgages therein referred to. One to Sarah Truitt, dated the third day of August, 1841, of a part of the leasehold property therein described, to secure the sum of $1,200, and interest. Another to Levi Benjamin, dated the 9th of April, 1842, of a parcel of said fee simple property, to secure the sum of $3,000, and interest, both of which mortgages were in full force, and unsatisfied at the time of the execution of said conveyance ; a third to John S. Darnell, and others, dated the 28th of May, 1840, on which there was then due the sum of $1,545, or thereabouts.

Exhibit No. 3, is a deed from said Elizabeth Osborne to said Samuel H. Goldsmith, dated the 16th of February, 1844, which, after reciting the mortgage of the 25th of November, 1842, proceeds as follows : "And whereas, in full payment,

satisfaction and discharge of the aforesaid mortgage debt of $21,500, and all interest thereon accrued, and for the further consideration of the sum of $7,750, the said Elizabeth Osborne has contracted and agreed to sell, convey and release, to the said Samuel H. Goldsmith, absolutely, all and singular, the property, premises, furniture and effects, mortgaged as aforesaid, and all her estate and interest, right, title, and equity of redemption therein, subject to the three mortgages therein described," (upon the last of which the sum of $502, only, was then due and unpaid,) "wherefore this instrument is executed," &c. The deed then conveys the equity of redemption of the grantor in said property, to the grantee, subject to mortgages aforesaid.

The answer of Goldsmith, to this bill, was filed on the 30th of Sept., 1845, and states that he has heard that Elizabeth Osborne, deceased, in said bill named, was in her lifetime indebted unto the complainants, or some of them, but of the particulars of such indebtedness, he cannot speak with certainty, and he is advised that he is not bound to admit or deny the very vague and indefinite averments in this behalf, made in said bill, but may require the complainants to prove the same, as they may be able. And for his further protection against such indefinite averments, he asks leave to insist, that if such pretended claims ever existed, which he does not admit, they are, and at the commencement of this suit were barred by limitations, and he prays to have like benefit of this defence, as if it was herein formally pleaded. He admits that said Elizabeth Osborne died some time in the month of April, 1845, but he knows nothing of the particulars or value of the property which she had at the time of her death, and cannot admit or deny that it was equal in value to the amount of the pretended claims set up in the bill. He admits the execution of the deed of which exhibit No. 1 is a copy, at or about the time of its date, and he avers that the consideration of $2,000 therein expressed, was parcel of a much larger sum at that time due and owing from the said Elizabeth, in her lifetime to the defendant, and was paid by discounting the amount of said consideration from said debt.

He avers that the premises conveyed by said deed, were purchased by him, *bona fide*, and absolutely, and without any trust or confidence expressed or implied for the benefit of the said Elizabeth. He denies that in making said conveyance, the said Elizabeth, or this defendant, had any view or intention of defrauding, delaying or injuring the creditors of the said Elizabeth or any of them, or of protecting said premises from their claims. On the contrary, he avers that the said Elizabeth was in good credit at the time of executing said deed, and he believes she was fully able to have paid all her debts. That he was placed in possession of said premises, and received the rents and profits thereof continually thereafter, until he sold and disposed of the same, which he did before the commencement of this suit, and before the death of the said Elizabeth.

He further avers, that confiding in her solvency, he continued to loan money to said Elizabeth, from time to time, until the 5th day of November, 1842, when upon settlement, she was found indebted to him on account of moneys loaned and advanced, and for moneys which had been loaned to her by the wife of the defendant, in the sum of $21,500. For this very large amount, defendant thought it expedient to ask for security, and at his solicitation, the said Elizabeth executed the deed of mortgage of which exhibit, No. 2 is a copy. He admits, that at that time, the said Elizabeth was indebted to other persons, though to what amount, he was, and is yet, ignorant, but did not consider her in insolvent or failing circumstances. On the contrary, she was in good credit and in possession and ownership of property, which he believed was of greater value than the amount of her debts. He denies that in making said mortgage, he, or the said Elizabeth, was influenced by any desire or motive to protect said property to, or for said Elizabeth, against her creditors, or to defraud or delay such creditors, or in any manner to injure them. He admits that, after the execution of said mortgage, the said Elizabeth remained in possession of the premises until the 6th of December, 1842, when finding the interest was suffered to remain in arrear, he filed his petition in Baltimore County Court, as a court of equity,

33*

and on the same day obtained a decree for a sale of the mortgaged premises. And, subsequently, on the 16th of February, 1844, the said Elizabeth having determined to remove to the city of New York, and having no other means of liquidating the claims of this defendant, against her, proposed to respondent that he should purchase her equity of redemption in said mortgaged premises, to which proposition respondent assented, and it was agreed that he should pay her therefor, the sum of $7,550, which was, as he believes, the full value of the said equity of redemption, and more than he would have given therefor, under any other circumstances. For the purpose of carrying out this agreement, the deed of the date last aforesaid, of which exhibit, No. 3, is a copy, was executed.

He avers that the consideration in said deed expressed, was, *bona fide*, paid and satisfied by him, to the said Elizabeth, in part by the discount of the balance of his account for interest, and for advances made by him to her, subsequent to said mortgage, being $ 3,250, and the residue being $ 4,500 in money, paid on the day of the execution of said deed. He avers that his only inducement to make this last purchase, was to acquire an absolute estate in the property mortgaged to him as aforesaid. He denies all motive, view or intention, thereby to protect said property, to or for said Elizabeth, against her creditors, or in any manner to defraud, delay or injure them ; nor does he believe, nor has he any reason for believing or suspecting that said Elizabeth, in executing said deed, or either of the preceding deeds, was influenced by any such improper motive or consideration. He denies that she ever declared to him, or in his presence or hearing, that the said deeds or any of them were executed without consideration, and for the purpose of protecting said property from her creditors. He does not know, nor believe, nor has he any reason for believing that any such declarations were made by her to any other person or persons, and he is advised and insists that he has no interest in instituting any such inquiry since her declarations made either prior or subsequent to the execution of said deeds, if any such were made, cannot prejudice the title which he has acquired, as

aforesaid, *bona fide*, and for a fair and valuable consideration. He denies that he has repeatedly, or at any time since he acquired title as aforesaid, admitted that said property did not belong to him, but that he held the title nominally to protect it from the creditors of the said Elizabeth. He denies that he ever executed before William A. Schaeffer, or any other person, an instrument of writing by which he acknowledged that he had no legal or just title to, or that he held all of said property, or any part thereof, for the benefit of said Elizabeth, or that he had only a lien thereon for a sum less than is mentioned in said deeds, on the contrary, he has at all times insisted and yet insists on the validity of his own absolute title, acquired as aforesaid. At the same time, he admits that at or about the time of executing the last of said deeds, he did verbally promise that he would re-sell the property therein described, to said Elizabeth, at any time she should become able and willing to repay him the moneys he had advanced her as aforesaid.

He further admits, that at the time the lost deed was executed, it was agreed between said Elizabeth and himself, that she should retain possession of all the property included in exhibits 2 and 3, until she should make all her arrangements for her proposed change of residence. She was to hold the same as tenant to this defendant, at a certain money rent, and was to pay off all arrears of taxes, ground rents, and premiums of insurance which should become payable during the said tenancy. The arrears of taxes were properly payable by her out of the purchase money agreed to be paid to her for her equity of redemption, and that it was for her ease and convenience that respondent agreed it should be paid as aforesaid. That in execution of this agreement, said Elizabeth retained possession of the premises, and paid the taxes, ground rents, and premiums of insurance as stated in the bill. That after her removal from the city of Baltimore, she admitted one Elizabeth Boyle into possession of said premises as her partner, agent, or under tenant, but he insists, that said Osborne continued his tenant, and as such remained liable to him for rents until the month of March, 1845, at which time, it was agreed between the said Osborne, Boyle

and respondent, the said Boyle should become tenant to respondent of said premises, in place of said Osborne, and an agreement, in writing, to that effect, was signed by said Boyle, since which time the said Osborne has ceased to have any interest whatever, in, or control over, or possession of, said premises; and at or about the same time, said Osborne assigned to him the policy of insurance on said property, which assignment was presented to the insurance office, but being rejected, this respondent, on the 3d day of April, 1845, and before the death of said Osborne, effected an insurance in his own name on said premises.    That in further exercise of ownership over said property, respondent, as early as the 29th of August, 1844, discharged the mortgage of parcel of said premises, to John S. Darnell and others, mentioned in said conveyances, and obtained a release therefor.    That, subsequently, Levi Benjamin, another mortgagee mentioned in said deeds, having obtained a decree for the sale of the premises mortgaged to him, a certain David Stewart, as trustee for Sarah Goldsmith, the wife of the respondent, purchased up said mortgage, and had the decree entered for his use as trustee as aforesaid; that this purchase was made to prevent a sale of, and for the protection of respondent's interest in said mortgaged premises.

He further states, that he is unable to state the particular times at which he made the loan to said Osborne, for security whereof, her promissory note for $21,500 was given him.    That at the time of his intermarriage with his present wife, Sarah Goldsmith, in or about the year 1832, said Osborne was indebted unto his said wife in a considerable sum of money.    From that time to the 5th of November, 1842, numerous loans were made by defendant to said Osborne, and the said note represents the result of all the dealings between her and defendant, including the sum due his wife as aforesaid, up to said dates.    Defendant avers that he has no books, or book of accounts.    In making his loans to said Osborne, he sometimes took her note, at other times, he would make a loose memorandum thereof, and again he would suffer the loan to rest in the recollection of the parties.    From time to time, settlements were had between the

said Osborne and himself, on which occasions, he would take her note for the balance ascertained to be due, and surrender or destroy all the securities before that time taken and then existing. He further states, that his claim against said Osborne, other than for money due his wife as aforesaid, was exclusively for, and on account of, moneys loaned by him to her. That in addition to his individual means, he obtained, occasionally, moneys from his wife, who had a valuable separate estate, of which he has kept no account, and presumes they are to be treated in law, as his own. That, excepting for a short period, about the year 1836, during which time he made his deposits with the Messrs. Cohen, he has been his own banker, taking care to keep his money actively employed, and, therefore, retained by him as small sums as possible. That he dealt indiscriminately in coin and in paper, and doubtless made some advances to said Osborne in coin, though for the most part, he believes, his advances to her were made in bank paper. He further states, that he has no counting house, or business office, nor any clerk or assistant in his business, and his dealings with said Osborne, was for the most part at his dwelling house, and either without witness or in presence of his wife alone, and sometimes, he believes, his advances were made by his wife in his absence. He is unable, at this time, to specify any instance in which he made advances in the presence of any particular individual, or to discover in what kind of money, in whose presence, at what places and at what times, he paid the said Osborne the sum of $7,750, the consideration for her last deed, except as herein before stated. This defendant has resided, during the last fifteen years, in the city of Baltimore, during that time, his pursuits have been various. For a number of years past, he has been engaged in the business of loaning money and dealing in securities and property. Of all the particulars of his business, during that series of years, and of the profits and losses on each of his transactions, he respectfully submits, he is not bound to speak, nor is he bound to discover what is the value, or what are the particulars of his present estate. To all such interrogatories, therefore, he declines an answer, and prays to be dismissed, &c.

On the 21st day of December, 1850, other parties came in by petition, and were made parties complainants to the bill, alleging themselves to be creditors of the said Elizabeth Osborne, and on the 4th of June, 1851, an amended bill was filed, by which the complainants in addition, allege that the several deeds impeached, were not, nor was either of them, executed, *bona fide*, by said Osborne, and that, even if there was in fact any consideration for said deeds, or either of them, they nevertheless were, and each one of them was, made and executed fraudulently, and covinously, with intent to disturb, delay, hinder and defraud the said complainants, and other creditors of said Osborne, in and of their just and lawful debts and actions, and that said Samuel H. Goldsmith fraudulently confederated with the said Osborne therefor. It was agreed, that said amended bill might be filed and treated as an amendment of April 1, 1851, filed by the whole of the parties, originally complainants, and subsequently made so, or applying to be made so, and that the answer of the defendant already filed, should be taken as an answer to said amended bill, &c.

Amongst other evidence taken under the commission, was the testimony of Grafton D. Spurrier, who stated that he was a conveyancer in the years 1841, 1842 and 1844. That in 1842, he prepared in his office, the mortgage exhibit, No. 2. That in 1844 he prepared the deed exhibit, No. 3. That when the mortgage was prepared, said Osborne and said Goldsmith were both present at his office, and the instructions for its preparation were given to the witness in the presence and hearing of both. That as regards the deed, No. 3, Goldsmith first called and told witness, that Elizabeth Osborne would call on him, (witness) about said deed, which she did, and gave deponent instructions as to its preparation. When Goldsmith came, he said that such a deed was to be prepared, and, that Betsy Osborne would call and give deponent instructions about it. He cannot speak positively as to any conversation at the time of executing the mortgage, except the taking of the memoranda for the preparation of it, which were acquiesced in by both parties. As to deed No. 3, his recollection is distinct. When

said Osborne called on him in relation to said deed, witness asked her if it was possible that she was about to convey her interest in said property to this man, and if she knew what she was about. She said that it was not to be an absolute deed of the property, that she had every confidence in Goldsmith, and that he would reconvey back to her the property, upon the payment to him of the sum of from $6 to $8,000,(he cannot recollect the precise sum,) and that Goldsmith would give her a written agreement to that effect. She stating, at the time, that creditors were pressing her, and that she made the deed absolute then, to prevent her creditors from seizing her property and dragging her furniture about and taking it out of her house. Goldsmith was not present at this conversation, and was not present at any conversation between deponent and said Osborne, except, at the taking of the memoranda or instructions for the mortgage.

Exceptions were taken by the defendant, to so much of said Spurrier's testimony, as speaks of a conversation between him and said Osborne in defendant's absence ; the same, and especially the declarations of said Osborne, made in the progress thereof, being inadmissible.

The case was removed to this court by suggestion on the part of the complainants, filed on the 4th of June, 1851, and was argued at the September term, 1851, and on the 11th of October, 1851, the following opinion was delivered :]

THE CHANCELLOR :

This is a creditor's bill, filed by the complainants, who also, allege themselves to be creditors of Elizabeth Osborne, to set aside certain deeds, executed by her to the defendant, upon the ground, that they were made to delay, hinder and defraud them, and are, therefore, void at common law, or under the statute of Elizabeth.

The deed of the 14th of July, 1841, the first in point of date, is not now called in question, and need not be noticed. The second deed, which is a mortgage of real and personal property, is dated on the 5th of November, 1842, and was executed

to secure the defendant the sum of twenty-one thousand five hundred dollars, which, according to the recital, was due from the mortgagor to him. This deed was executed in pursuance of the provisions of the act of 1833, ch. 181, and in conformity therewith, a petition was filed on the equity side of Baltimore County Court, on the 6th of December, 1842, and on the same day a decree was passed by that court, providing for the sale of the real estate and chattels real, for the payment of the mortgage debt, with interest, when it should become due, according to the terms of the mortgage, as by the said act is authorized.

This decree, as is shown by a record thereof, filed in this cause, now remains in the Baltimore County Court, and it is no part of the object of the present bill, to interfere with it in any way. Prior to the period limited for the payment of the money by the terms of the decree, that is to say, on the 16th day of February, 1844, the mortgagor, Elizabeth Osborne, conveyed to the defendant, the mortgagee, her equity of redemption in the mortgaged premises, for the consideration as expressed in the conveyance of $7,750, and this conveyance, also, is impeached by these complainants. I do not understand it to be insisted that this court has the power to vacate or annul the decree of Baltimore County Court, that court by the terms of the act of assembly referred to, having concurrent jurisdiction with this court to pass decrees, upon mortgages of this description, upon the *ex parte* application of mortgagee, or his assigns, and as the decree passed by Baltimore County Court, upon the mortgage, is not to be called in question in this court, I do not clearly see how the mortgage, the foundation of that decree, can be impeached here.

But even if this objection could be overcome, and it would be competent for this court to set aside the decree of Baltimore County Court, this bill does not ask for the exertion of any such power, its object and prayer being to vacate the deeds, and not the decree passed upon one of them, and if, therefore, this court should now pronounce the mortgage of November, 1842, fraudulent and void, it would be adjudging that void, which a

court possessing equal powers with itself, had given relief, and to which relief this bill makes no objection. Suppose this court should declare this mortgage fraudulent against the creditors of the mortgagor, and the mortgagee should afterwards proceed to carry his decree upon it, in Baltimore County Court, into execution, would it be competent to this court to interfere and prevent his doing so? Would it not be quite as competent to Baltimore County Court to pronounce the decree of this court, vacating the mortgage, a nullity, as for this court to adjudge the decree of Baltimore County Court, upon the mortgage, void? It seems to me, it would be dangerous to place the two courts in this position of antagonism, when there can be no absolute necessity for it, and I am, therefore, unwilling to do so. If the plaintiffs seek to avoid the mortgage, and the decree passed upon it in Baltimore County Court, upon the ground of fraud, let them file a bill in that court for that purpose, and if they can establish the fraud, there can be no doubt they will be relieved.

I, therefore, forbear expressing any opinion upon the mortgage of November, 1842, and proceed very briefly to consider the case as it relates to the deed of the 16th of February, 1844.

This is a conveyance of the mortgagor's equity of redemption, and there are circumstances apparent upon the face of the transaction, and altogether independent of the evidence *aliunde*, offered to establish the fraud, which involve it in suspicion. The principal of the mortgage debt, by the terms of the instrument, was not to become due until November, 1847, and the decree passed by Baltimore County Court, on the 6th of December, 1842, gave the mortgagor, until the 1st of December, 1847, to pay the debt, with the interest thereon, and no sale under the decree could have been made until that time should arrive. There was, therefore, on the 16th of February, 1844, when the deed in question was executed, no motive pressing upon the mortgagor, to part with her right to redeem this property. The debt had, then, more than three years to run, and it is not at all likely, that under such circumstances, the mortgagor would have been disposed to anticipate its payment, and thus deprive herself of the advantage of the probable

34

appreciation of the property in the interval. There is, more-over, something suspicious in the account given by the defend-ant, of this transaction, and in his statement of the motives by which he was influenced, as he says, in making the purchase. He speaks of further advances made by him to Mrs. Osborne, subsequent to the date of the mortgage, which, with his claim for interest on the mortgage debt, amounted, as he says, on the day the deed of February, 1844, was executed, to $3,250, and that on that day, he paid her in money, the sum of $4,500, making the aggregate sum of $7,750, which, he says, formed the consideration of the deed, and was the full value of the equity of redemption, and more than he would have given therefor, under other circumstances. The court does not see, in these circumstances, any reason or motive, to induce the de-fendant to give more for the property, than he would, as he de-clares, otherwise have been disposed to give. He had a de-cree for his mortgage debt, securing the payment of principal and interest, at the stipulated period, and if he had made the mortgagor further advances, as he states, that furnished no reason why he should advance in cash the large additional sum of $4,500, to acquire the title. Lenders of money, say the Court of Appeals, in the case of *Dougherty* vs. *McColgan*, 6 *Gill & Johns.*, 281, "being less under the pressure of circumstances, calculated to control the free exercise of judgment, than bor-rowers, they may often be tempted to avail themselves of that advantage, in order to attain inequitable bargains." The lean-ing of courts of equity, is therefore against them, and presump-tions are not made in their favor. In this case, all the advan-tages of position were with the defendant. He had a mortgage and decree for a large sum of money, and there is no circum-stance connected with the transaction, which would induce a man of ordinary prudence, to give more for the property, than his unbiased opinion would prompt him to give. The case, moreover, is singularly defective in evidence, in regard to the payment of the consideration, by the defendant, and his refus-ing to answer, respecting his means to command such large sums, is certainly a circumstance from which unfavorable infer-ences may be drawn.

It has been argued by his counsel, that if the reasons given by the defendant, for not giving this information, were not satisfactory, exceptions should have been filed, and a fuller answer thus extorted from him, and there can be no doubt that his refusing to answer, is not to be taken as an admission of the allegations of the bill, which have not been answered. But this rule of chancery practice does not exempt the defendant from some degree of suspicion, because of his declining to answer interrogatories, which might easily have been answered, and without, so far as the court can see, subjecting the defendant to the slightest annoyance or inconvenience. It will be seen, upon referring to the case of *Joice and Wife* vs. *Taylor*, 6 *Gill & Johns.*, 54, that the court lay no little stress upon the caution displayed by the defendant in that case, in answering, or evading to answer, an allegation of the bill, and that it evidently had some influence upon the decision of the cause.

The court cannot, however, shut its eyes to the extraordinary account given by the defendant, of his dealings with Mrs. Osborne. It must strike the mind as strange, indeed almost incredible, that transactions involving such large amounts of money, should take place with such utter disregard of the ordinary precautions which persons having any regard for their interests, usually observe. The defendant says, "he kept no book of accounts," "in making his loans to the said Elizabeth Osborne, he sometimes took her notes," "at other times, he would make a loose memorandum thereof, and again, he would suffer the loan to rest in the recollection of the parties." These statements are made with reference to the debt of $21,500, for which the mortgage of November, 1842, was given, but it does not appear that the defendant was more careful in his subsequent transactions with Mrs. Osborne, or that he kept any accounts of the advances, which he alleges he made her, after November, 1842, and which constituted a part of the consideration of the conveyance of February, 1844. There is, unquestionably, about this whole case, a character of reckless carelessness, which is absolutely amazing, and which, in the eyes of prudent men, cannot fail to stamp it with suspicion.

The parol evidence, also, is strong in opposition to the deed.

In view of all the circumstances which have been mentioned, there would, perhaps, be quite proof enough to overthrow the conveyance of the equity of redemption, without the evidence of Mr. Spurrier, but I am of opinion, that the declarations made by Mrs. Osborne to him at the time she executed that conveyance, are admissible.    If the case of *Merrill* vs. *Meacham*, 5 *Day*, 341, is authority, it concludes the point.    In that case, the declarations of a grantor, made at the time of the execution of the deed, the grantee not being present, were admitted in evidence, as part of the *res gesta*, and as constituting an essential part of the facts necessary to understand the transaction.    The force of that case is attempted to be broken, by remarks upon the flagrant character of the fraud which the grantor was about to perpetrate upon his creditors, but in answer to this, it may be said that the grantee was no party to this fraud, not even having any knowledge at the time of the execution of the deed, and that when it did come to his knowledge, he paid a valuable consideration for so much of the property as he agreed to accept.    It seems to me, however, that the admissibility of this description of evidence cannot depend upon the degree of fraud.    Whether it be more or less enormous, or whether there is, or is not, fraud in the transaction, is to be ascertained when the proof is introduced, and to say, that the proof shall not be offered, until the fraud is established, is to say, it shall not be offered until the necessity for its introduction is removed.    In truth, in this case of *Merrill* vs. *Meacham*, the gross character of the fraud was made out by the declarations of the grantor.    In the case now under consideration, there is a reason for letting in the declarations of the grantor, which did not exist, in the case in *Day*.    In this case, the grantee first called on the scrivener, who prepared the deed, and told him, the grantor would call on him, and give him instructions about it.    She did call accordingly, gave the instructions, and the deed was prepared, and executed, and her declarations then made, are now offered to show that the object was to defeat her creditors.    It seems to me, that by referring the draftsman of the deed to the grantor for instructions, the grantee must be considered, to some extent at least, as constituting the grantor, his agent, and then, of

course, the declarations of the agent made in the course of, and accompanying the transaction would be admissible. *Franklin Bank* vs. *Steam Company*, 11 *Gill & Johns.*, 28.

But at all events, the circumstance that the grantee gave no instructions himself, being willing to take any deed which the grantor might have prepared, certainly is calculated to show, that the deed was intended rather for the benefit of the latter than the former. We find by the evidence of the same witness, that when the mortgage of November, 1842, was prepared, both parties were present, and the instructions for its preparation were given in the presence and hearing of both, and it is certainly not unreasonable to suppose that if the grantee had felt himself to be interested in the deed of 1844, he would have given some instructions in regard to it.

Taking, then, these declarations as evidence, and considering them in connection with all the other evidence in the cause, I am of opinion, that the deed of the 16th of February, 1844, cannot be supported, as against the creditors of the grantor, which makes it necessary to inquire whether these complainants, or any of them, have established their right, as creditors to call them in question. Sarah Ann Twist was one of the parties in the original bill which was filed on the 25th of August, 1845, and her claim, therefore, for $1,100, founded on the note of Elizabeth Osborne, dated the 6th of November, 1843, at twelve months, is certainly within time, and I think she has a standing in court, as a creditor, in respect of that note.

By an amended bill, filed as of the 1st of April, 1851, certain other parties come in as complainants, and I am of opinion, that according to the law and practice of this court, there is no objection to their coming in at that stage of the cause. *Hall* vs. *Creswell et al.*, 12 *Gill & Johns.*, 36. But, although they may come in as co-complainants, with the originally suing creditors, limitations will run against their claims until they do so come in, and file them. This point, also, was expressly decided by the case last cited. Certain of the parties to the amended bill, have proved their claims, to wit: Walter Crook, Hyde & Carter, Hamilton Easter & Co., Harrison & Co., and Ann

34*

Vickery, but the claim of the last party appears to have been paid. Notwithstanding, however, the claims of these parties have been proved, the plea of limitation, relied upon in the answer, must bar the remedy upon them, unless the fraudulent character of the transaction, saves them from the operation of the statute, and this is a question not free from difficulty. In *Beach* vs. *Cotlin*, 4 *Day*, 284, the Supreme Court of Connecticut said, that a grantee under a fraudulent conveyance, could acquire no title by possession, against the creditors of the grantor, for whom the grantee held the land in the nature of a trustee for them.

This general remark, however, was made in an action of eject-ment, and it will be found, upon an examination of the case, that the title of the plaintiff, who was a judgment creditor, was not as-serted until within less than four years before the commencement of the suit; and, that, therefore, the defendant's possession until his title accrued was not adverse to him, nor was it incon-sistent with the right of the grantor, for he had none. The possession of the defendant in that case, was a mere naked pos-session, being adverse neither to the title of the grantor, nor to the plaintiff before he levied his execution upon the land, and the action was brought within the period allowed by the statute after such levy. In the case now before this court, the plain-tiffs must in the first place show themselves to be the creditors of Elizabeth Osborne, and then that the deed they seek to put out of their way, is a fraud upon them as such creditors. The question, so far as it involves the existence of their claims, is of a legal nature, or at any rate, would be cognizable at law, and in such cases, courts of equity govern themselves by the same limitations as the statute prescribes to suits in the common law courts, acting not upon the ground of analogy but in obedience to the statute. 1 *Story's Equity*, section 529; 2 *ib.*, section 1520; *Dugan et al.* vs. *Gittings et al.*, 3 *Gill*, 161. Cases have been cited to show that length of time ought not to be permitted to repel relief when fraud is imputed and proved. Such was the language of the Supreme Court, in *Prevost* vs. *Gratz*, 6 *Wheat.*, 481, but the same case proves that the party,

relying upon the fraud to excuse his delay, can only do so successfully when the fraud has been concealed from him. And cases are numerous to show that this is the true doctrine. In a note to *Pickering* vs. *Lord Stamford*, 2 *Vez. Jr.*, 272, several cases are referred to, establishing the proposition, that in cases of fraud and mistake, the statute of limitations begins to run from the time of the discovery of the fraud or mistake. Such was said by Chancellor Kent to be the settled rule in Chancery, in the case of *Kane* vs. *Bloodgood*, 7 *Johns. Ch. Rep.*, 122. The language there used is, "that after the discovery of the fact imputed as fraud, the statute runs as in other cases." It cannot be necessary to multiply authorities upon this point, because it is believed, no case can be found, in which relief has been extended to a party in equity in opposition to the statute of limitations, upon the ground of fraud, when the fact imputed as fraud, was discovered by the party at a period beyond the time allowed by the statute for the assertion of his rights.

This being the rule, I do not see upon what principle the complainants, Walter Crook, Hyde & Easter, Hamilton Easter & Company, and Harrison & Company, can escape the objection of the statute. They came in for the first time, on the 1st of April, 1851, when the amended bill was filed, and then, more than double the period allowed by the statute of limitations had elapsed since the maturity of their claims. Their claims are of a legal nature, cognizable in a court of law, and consequently this court is bound by the provisions of the statute, equally, and to the same extent as if they were attempting to recover them in a court of law. If they seek to get rid of the statute upon the ground of fraud, the answer is, that the deed of the 16th of February, 1844, the imputed act of fraud, was recorded on the day of its date, which is constructive notice to all the world.

But in addition to these views of the subject, it seems to me, the case is concluded by the decree of the Court of Appeals of this state, in the case of the *Farmers' Bank of Maryland* vs. *Benjamin Mullikin et al.*, passed at December term, 1840. In that case, certain deeds were declared to be fraudulent against

the creditors of the grantor, and yet the plea of limitations was allowed to avail those of the parties claiming under those deeds, who relied upon it.   The only difference between that case and this, is, that there the deeds were made to the son and daughter of the grantor who may not have participated in the fraud. But that circumstance, it appears to me, cannot vary the principle.   The deeds are adjudged to be fraudulent, as against the creditors of the grantor, and I can conceive of no reason, why a fraud, in which both grantor and grantee co-operate, shall not be within the statute of limitations, whilst a fraud, perpetrated by the grantor alone, shall be.   The effect upon the creditors is precisely the same, and the fraud cannot be more severely condemned in the one case than the other.

I will, therefore, sign a decree vacating the deed of the 16th of February, 1844, and directing the equity of redemption to be sold, for the payment of the claim of Sarah Ann Twist for $1,100, founded upon the note of Elizabeth Osborne, dated 6th of November, 1843, and the claims of such other of the creditors of the said Elizabeth Osborne, as may come in and establish their claims.   The decree will reserve for further directions the question in relation to the claim of Sarah Ann Twist, upon the note for $2,800, dated 21st of October, 1844, payable twelve months after date.   The evidence shows that Elizabeth Osborne removed to New York in November, 1844, before the note matured, and there are no facts in the cause from which it can be fairly inferred, that she could ever have been sued in Maryland upon that note.   Indeed, if it be true that she died in April, 1845, and there has been no administration on her estate, limitations could never have commenced to run against this claim.   The bill, as to the other complainants, will be dismissed.

———

JOHN GLENN, CHARLES H. PITTS and S. T. WALLIS for Complainants.

WM. H. COLLINS, THOS. S. ALEXANDER and WM. P. PRESTON for Defendant.